MABEL DAY, ADM'X, ETC., v. R. Y. CROSS ET AL.

(Case No. 4731.)

1. SALE OF CATTLE — CONSTRUCTION OF CONTRACT.— Contract November 29th, whereby M. sold D. certain marks and brands of cattle, containing ten thousand head, "more or less," to be delivered August 1st, tnereafter, at a designated place, at $9.50 per head for the cattle actually delivered; those not delivered to remain the property of M., the seller. Only five thousand and sixty-one head were delivered. Action for balance due upon the cattle delivered. No fraud was alleged. *Held*,

(1) That the contract was for the sale of the marks and brands without reference to the estimated number.

(2) That the only question was whether the vendors had used due diligence in the collection and delivery of the cattle in the designated marks and brands.

(3) That in the absence of any stipulated degree of care and diligence, the law imposes upon the vendors reasonable care; that is, such skill, energy and diligence in delivering the cattle, so to be delivered, as a good business man would use to collect said stock of cattle within the time and at the place stipulated.

2. TENDER — EFFECT OF.— The tender of cattle of the stipulated stocks (marks and brands), and the refusal to receive them by the purchaser, would have the effect of taking those so tendered out of the contract, so far as the right to recover for their non-delivery.

3. MEASURE OF DAMAGES.— In a contract for delivery of cattle, the purchase money not being paid, the measure of damages is the difference between the contract price and the market price at the time and place of delivery, with interest thereon to time of trial.

4. PRACTICE — WRITING NOT IN ISSUE. — A suit on a contract in writing for the purchase money on such stock of cattle, the contract reserving a lien, the contract being recognized in the pleadings of both parties, *held*,

   (1) Not necessary that the lien be passed upon by the jury.

   (2) That upon a finding of amount due on the contract, the court may decree foreclosure upon the property.

5. TESTIMONY. — Admissions of one of the vendors, made before or after the execution of the contract, were irrelevant, such admissions only tending to show the number of the cattle in the stocks sold.

APPEAL from Travis. Tried below before Hon. A. S. Walker.

Suit in the district court of Travis county, begun the 26th day of December, 1881, by R. Y. Cross, William Mullins, Charles Mullins and Julia Barron (the latter being joined by her husband, ——— Barron), the last-named two as the heirs of Isaac Mullins, deceased, against J. L. Driskill, as administrator of the estate of William H. Day, deceased, to establish a claim against said estate for the sum of $18,079.50, and interest from the 1st day of April, 1881, at the rate of ten per cent. per annum, claimed to be owing on a contract of sale and for delivery of certain cattle, and also to establish a lien on the cattle delivered, alleged to exist to secure the payment of the claim sought to be established. Pending the suit Driskill resigned, and Mabel Day was appointed administratrix, etc.

The contract was as follows:

" THE STATE OF TEXAS, *County of Concho.*

" This agreement, this day entered into by and between Isaac Mullins, William Mullins, Charles Mullins and Riley Cross, of Tom Green county, parties of the first part, and William H. Day, of Coleman county, Texas, by his agent and attorney in fact, S. R. Goodrum, parties of the second part, witnesseth:

" 1st. That said parties of the first part do hereby bargain and sell unto party of the second part, all of the cattle in the following marks and brands, viz.:

ten thousand head, *more or less*, save and except one hundred head of she cattle of each of the following brands: \C and \WM\; also fifty in the \X\+ brand; said party of the second part to pay to said parties of the first part, at the rate of $9.50 per head, for each and every head of said cattle delivered on or before the 1st day of August, 1881.

" 2d. Said parties of the first part do hereby agree and bind themselves to deliver *all of said cattle* at the chute in Day's pasture, at Day's ranch, in the county of Coleman, and state of Texas, by the

1st day of August, 1881; and they do further agree and bind themselves to deliver to said party of the second part, *five thousand head* of said cattle at said chute before the 1st day of April, 1881.

"3d. It is expressly understood that *only* the cattle of the aforementioned marks and brands, which are *actually delivered* to the party of the second part by parties of the first part, *are sold* to said party of the first part; and that all the *cattle* in said brands *left on the range* after the 1st day of August, 1881, are not embraced in this sale, but remain the property of the parties of the first part.

"4th. Said party of the second part hereby agrees and binds himself to pay to parties of the first part the sum of $9.50 per head for each and every head of cattle in said marks and brands delivered to him at his pasture, as above set out, on or before the 1st day of August, 1881. Increase of the cattle, born after the 1st day of January, 1881, are to be delivered, but not to be counted or paid for.

"5th. Said party of the second part hereby binds himself to make the payment for said cattle as follows: Twenty thousand dollars to be paid to parties of the second part on the 1st day of April, 1881, at Coleman City, in the county of Coleman, provided there should have been a sufficient number of the cattle delivered to amount to $30,000. The balance of the purchase money to be paid in two equal payments, as follows: the first payable on the 1st day of April, 1882, and the second to be made on the 1st day of April, 1883. And it is hereby agreed that party of the second part shall execute his promissory notes to parties of the first part for said two deferred payments, when the delivery of said cattle is completed on the 1st of August, 1881, and that said notes shall bear interest from the 1st day of April, 1881, at the rate of ten per cent. per annum until paid.

"6th. Party of the second part hereby binds himself to pay to parties of the first part the sum of $10,000 at the banking house of J. H. Raymond & Co., in the city of Austin, on or before the 15th day of December, 1880, and is to be and constitute a cash payment on said cattle in addition to the $20,000 to be paid on the 1st day of April, 1881; said $10,000 to be placed to the credit of parties of the first part at said bank of J. H. Raymond & Co.

"7th. And it is hereby agreed and understood by all the parties to this instrument of writing that there is hereby retained a lien or mortgage upon said cattle to secure parties of the first part in the payments above stipulated for.

"8th. And it is hereby agreed by parties of the first part that party of the second part may relieve himself from the lien retained in article seven of this agreement at any time by executing to parties

of the first part a mortgage or trust deed upon other good and sufficient property to secure them in the payment stipulated for in this instrument or agreement, said parties of the first part to be the judges of the value of the property upon which lien is proposed to be given as mentioned in this article.

"In testimony whereof witness our hands, this 29th day of November, A. D. 1880."                     (Signed by the parties.)

After the contract Isaac Mullins died, leaving Charles Mullins and Julia Barron as his only heirs. There was no administration on the estate of Isaac Mullins, and the right existed in Charles Mullins and Julia Barron to assert the rights of Isaac Mullins under the contract.

There was delivered to W. H. Day under the contract, at various times, cattle to the aggregate number of five thousand and sixty-one head, and no more, the last delivery being made on the 27th day of May, 1881.

The aggregate contract price of the cattle delivered amounted to $48,079.50. Day paid the advance cash payment of $10,000 by placing that sum to the credit of the vendors of the cattle in the bank of Jas. H. Raymond & Co., at Austin, Texas, and he also made the second payment of $20,000 at Coleman City on the 1st day of April, 1881. This left a balance unpaid on the contract price of $18,079.50, being amount sued for.

The charge of the court, approved by the opinion, was as follows:

"In this case the plaintiffs sue for the purchase money of five thousand and sixty-one head of stock cattle delivered upon a contra between them and William H. Day, deceased, at $9.50 per head, less $30,000 credits.

"The defendant, after pleading a general denial, specially pleads the contract sued on; admits the delivery of five thousand and sixty-one head of cattle upon the contract, but claims damages for an alleged breach of the contract, charging that the plaintiffs failed to use proper and reasonable care, diligence and energy in gathering said cattle, and negligent and wilful failure to comply with said contract, in that they could have delivered a large number more than they did, and that the price and value of said cattle had increased largely between November 29, 1880, the date of the contract of sale, and August 1, 1881, the date of final delivery under it; the difference in value is asked upon all not so delivered by the plaintiffs as damages for breach of said contract. The contract, which is in evidence, and the basis of this litigation, is a contract for the sale, by Isaac Mullins (deceased, and represented in this suit by his heirs, Charles Mullins and Mrs. Julia Barron), William Mullins, Charles

Mullins and J. R. (or Riley) Cross to Wm. Day, of all of the cattle in the following marks and brands, viz.: (same as in contract), for $9.50 per head for each and every head of cattle so delivered on or before August 1, 1881.

"The parties, Mullins and others, contracted to deliver all of said cattle at the chute in Day's pasture, in Coleman county, Texas, by August 1, 1881 — five thousand head to be delivered by April 1, 1881. In the contract it was expressly understood that only the cattle in said marks and brands, which should be actually delivered to Wm. H. Day by the said Mullins and others, *were* sold to said Day, and that all of said marks and brands left in the range after August 1, 1881, were not sold but remained the property of the said Mullins *et al.* There is no litigation upon the other parts of the contract.

"The jury are instructed:

"1. That said contract contained no guaranty as to the number of the cattle in said mark and brands.

"2. That it was not a sale of said cattle, but was a contract for the sale (to be perfected by delivery) of said mark and brands, and an undertaking by the sellers (or vendors) to deliver said stock within the specified time, limited to August 1, 1881.

"3. Only such as were actually delivered by the 1st day of August, 1881, passed by said sale to Day. The remainder of said stock of cattle remained unaffected by said contract.

"4. Under said contract the vendors had the right to reserve the two hundred and fifty head of *she cattle* out of any of said marks and brands, at whatever time gathered.

"5. Mullins and others (the vendors) having contracted to deliver said cattle by the 1st August, 1881, they were obliged to use, to effect such delivery, that *care, skill and energy* which a good business man engaged in the stock business would use to collect said stock of cattle and deliver them at the chute in Day's pasture between November 29, 1880, and August 1, 1881, taking them from the range where they were accustomed to run at the making of the contract, up to August 1, 1881.

"6. If any of said stocks were sold by Mullins (acting for plaintiffs) by or with the consent of Day, such cattle so sold, if any, were thereby taken out of the said contract.

"7. If any of said stocks of cattle were tendered to Driskill (administrator of Day) upon said contract, and were without cause rejected, then such cattle so rejected, if any, were by such tender and rejection taken out of said contract. Touching this subject of ten-

der the court charges that neither Mullins (for plaintiffs) nor Driskill (Day's administrator) had the power to add to the conditions of the contract. If the cattle tendered were of the mark and brands specified in the contract, it was the duty of Mullins to deliver them, and of Driskill to receive them on the contract. That cattle of said mark and brands were of inferior quality would be no reason for their rejection. Nor had Driskill the right to insist upon the additional delivery of any definite number of cattle conditional to his receiving any cattle in the mark and brands specified, if shown to have been tendered upon the contract. If it appear from the testimony that Mullins (for plaintiffs) had delivered the said stocks of cattle (including in the delivery those tendered), or if Mullins had used such *due diligence* to deliver them as before defined in paragraph No. 5 of this charge, then it would not have been an addition to the contract (nor a cause for rejection of the cattle) for Mullins to insist upon such delivery as a satisfaction or compliance with the obligation of Mullins (for plaintiffs) to gather and deliver said cattle. Under such conditions the legal effect of such final delivery would be a discharge. If, however, it appear from the testimony that there was a tender by Mullins (for plaintiffs) of said cattle, upon condition that they be received in full satisfaction, or as a discharge of their obligation to deliver the cattle, when it was not true, or shown by the testimony, that Mullins had either delivered (including those tendered in the delivery) all said stocks, or had used due diligence, as defined above in paragraph No. 5, then Driskill (Day's administrator) was authorized to reject said cattle so tendered, and the plaintiffs would be liable for damages for not delivering them.

"8. The plaintiffs are entitled to the purchase money at the contract price, $9.50 each, for all the cattle the testimony shows to have been delivered on the contract, with interest at ten per cent. per annum from April 1, 1881. This finding to be subject to alteration or control by the jury upon the issues tendered by the defendants.

"9. If, from the testimony, it is shown that the plaintiffs (or those they represented) failed to deliver said stocks of cattle by August 1, 1881, and failed to use such diligence as is defined in paragraph No. 5 of this charge, for the collection and delivery thereof, then the jury will allow defendant damages; and the measure of damages is the difference, if any, shown by the testimony between the contract price ($9.50 per head) and the market price or value of such cattle at the time and place of final delivery,

*for all of said cattle* of said mark and brands which were not so delivered, and which, by the use of diligence, as above defined, the plaintiffs could have delivered at the said time and place.

"10. If, from the testimony, it be shown that Mullins and others (the plaintiffs) complied with their obligation to gather and deliver said stocks, or used the diligence to effect the gathering and delivery, of said stock as defined in paragraph 5 of this charge, then the jury cannot find any damages for the defendant against the plaintiffs.

"11. If the jury do not find damages under paragraph 9 of this charge, they will then find the amount of purchase money for such cattle, if any, the testimony may show were delivered upon said contract at $9.50 per head, and interest at ten per cent. upon such sum from April 1, 1881, to this date.

"12. If the jury do find damages under paragraph No. 9 of this charge, then they will find the difference in favor of the party in whose favor such difference, between the *purchase money* and *the* damages, may be, and if such balance is in favor of plaintiffs the jury will compute interest thereon at ten per cent. from April 1, 1881. . . ."

The testimony was conflicting as to the number of cattle in the several brands sold; as to the degree of diligence used by the vendors in the collection of the cattle; as to the difference in the price of cattle August 1, 1881. There being testimony of some cattle dealers and many cow-boys that the ruling price at Day's pen at that time was $15 per head; while a great amount of testimony by cattle men and dealers showed that, at the same time and place, the price was from ten to ten and a half dollars per head.

Testimony was offered and excluded of the declarations of Charles Mullins, one of the plaintiffs, touching the number of cattle in the several brands, made before and after the sale to Day. The testimony was excluded. The opinion sufficiently shows the nature of the excluded testimony.

The defendant asked charges as to measure of damages that the rule was the difference between the contract price and the highest market price subsequent to that date. The instruction was refused. Other instructions were refused because substantially given in the general charge of the court.

The jury returned a verdict, November 10, 1882, as follows:

"We, the jury, . . . find for the plaintiff the sum of twenty thousand nine hundred and eighty-seven $\frac{28}{100}$ dollars. And we further find that the said plaintiffs, by failure to comply with the con-

tract, have damaged the said estate of W. H. Day, deceased, the sum of fifteen hundred dollars."

Upon this verdict the court deducted the damages from the amount found for the plaintiffs, and set against the same as a credit at the date at which the debt found due the plaintiffs began to bear interest (April 1, 1881); judgment being for the excess of the debt over the damages, viz., for $19,246, —— for costs of suit; decree establishing same as a secured claim against the estate of W. H. Day; and a valid subsisting lien upon all the cattle in the marks and brand specified in the contract delivered under said contract, and now in possession of defendant; and certifying the judgment and decree to the probate court for observance.

*Sheets & Sneed, John Hancock* and *Smith & Trigg,* for appellant.

The charge of the court ignores the terms of the contract, the effect of the contract being a bargain and sale of all the cattle in the specified marks and brands, "ten thousand head, more or less" (except the two hundred and fifty reserved), and an absolute agreement to deliver *all the cattle* so bargained, the obligation to deliver *all the cattle* not being qualified by the use of the words "more or less."

As to effect of words "more or less," they cited Caldwell v. Moore, 3 Dana, 346; Hurt v. Stull, 3 Md. Ch., 28; Noble v. Googin, 99 Mass., 235; Tilden *et al.* v. Rosenthal *et al.*, 41 Ill., 386; Cabot v. Winson, 1 Allen, 551; Brawley v. U. S., 6 Otto, 170.

The words "more or less," used in the contract, in connection with the number of cattle (ten thousand head), did not relieve the appellees from the obligation to deliver to appellant a number of the cattle approximating the number of ten thousand; the words more or less being intended to relieve appellees for non-delivery of such trifling number of the cattle as they might be prevented from delivering by causes which they could not anticipate and provide against. Pembroke Iron Co. v. Parsons, 5 Gray, 591; Bourne v. Seymour, 16 C. B., 337; Weart v. Rose, 1 C. E. Green, 290; Smith v. Fly, 24 Tex., 345; O'Connell v. Duke, 29 Tex., 309; Rich v. Ferguson, 45 Tex., 396.

The discrepancy between the number of cattle delivered (five thousand and sixty-one) and offered for delivery (five hundred) combined, and the number contracted to be delivered (ten thousand), is so great as to raise the presumption of fraud, imposition or gross mistake on the part of appellees, and render them liable for a breach of the contract as though they could have delivered the entire num-

ber of ten thousand. Noble v. Googin, 99 Mass., 235; Hurt v. Stull, 3 Md. Ch., 28.

If there were in fact not ten thousand head of cattle in the specified marks and brands, and for this reason it was impossible for appellees to deliver that number, there being no fraud on the part of Day in obtaining the agreement to deliver, and the contract, on its face, not appearing to be one which was impossible to perform, appellees were liable, in not delivering the number of cattle specified, for breach of the contract. Pollock's Principles of Contract, p. 356 et seq., and authorities there cited; Hills v. Sughrue, 15 M. & W., 253; Parsons on Contract, 2d vol., p. 184 et seq., and authorities thereunder; Add. on Con. (Morgan's ed.), vol. 1, p. 478, § 327.

The court erred in that part of the main charge to the jury which laid down the rule as to the extent and measure of damages to be recovered by the defendant. This assignment is the proposition.

In the fifth paragraph, or division, of the charge of the court, the jury were instructed in substance: That in the fulfilment of the contract to deliver the cattle, appellees were obliged to use, to effect such delivery, that care, skill and energy which a good business man engaged in the stock business would use to collect said stock and deliver them between November 29, 1880, and August 1, 1881, taking them from the range where they were accustomed to run at date of making of the contract, up to August 1, 1881. By the ninth paragraph of the charge the right of appellant to recover damages is limited to such cattle as were not delivered and which appellees could have delivered by the use of the diligence defined in paragraph fifth of the charge.

The appellant was entitled, as damages, to the difference between the contract price of the cattle ($9.50 per head) and the highest market value per head between August 1, 1881, and date of the trial (November, 1882).

As to measure of damages, Randon v. Barton, 4 Tex., 289; Calvit v. McFadden, 13 Tex., 324; Cartwright v. McCook, 33 Tex., 612; Gregg v. Fitzhugh, 36 Tex., 127; Brasher v. Davidson, 31 Tex., 190; Flake v. Nuse, 51 Tex., 98; Parsons on Contracts, vol. 2, p. 155, and authorities there cited; Add. on Contracts, sec. 357; Chitty on Contracts, pp. 1194–5; Brock v. Jones, 16 Tex., 467; Draper v. Hill, 43 Vt., 439.

Walton & Hill, for appellees.— The charge of the court was correct. Weir v. McGehee, 25 Tex. Sup., 30, 31; O'Connell v. Duke, 29 Tex., 309–314; Rich v. Ferguson, 25 Tex., 398; Sparks v. Daw-

son, 47 Tex., 147–8; Brawley v. U. S., 96 U. S., 171–3; Robinson v. Noble's Adm'rs, 8 Pet. (U. S.), 195–198; Young v. Craig, 2 Bibb (Ky.), 272; Benjamin on Sales, 3d Am. ed., 690, 691.

WILLIE, CHIEF JUSTICE.— The decision of this cause depends in a great measure upon the true construction of the contract on which the suit is brought as to the number of cattle the appellees were bound to deliver to Day or his representatives. If, by the terms of that contract, they were absolutely bound to deliver by the 1st of August, 1881, ten thousand head, or reasonably near that quantity, then, as they delivered and tendered but little over half that amount, their contract was violated and they should not have recovered the verdict they did. If, on the other hand, the number to be delivered depended upon what they could, with the proper use of skill, care and diligence, collect and turn over to appellant at the place and by the time appointed, then the turning point in the case is as to the amount and degree of such care, skill and diligence exercised by the appellees in making such delivery. Contracts for the sale of goods, in which the quantity to be delivered is qualified by the words *more or less*, and the purchase money is to be determined by the number of articles delivered, are thus classified by the supreme court of the United States in Brawley v. U. S., 6 Otto, 171:

1. When the contract is to furnish goods of a certain quality or character to a certain amount.

2. When the contract is to furnish or sell certain goods identified by reference to independent circumstances, such as an entire lot deposited in a certain warehouse, etc.

3. When other qualifying words are added, the more clearly to explain what the intention of the parties was in naming the quantity, and allowing the contract to be performed by delivering more or less of it. For instance, when some future act on the part of the seller or purchaser is to fix the quantity of goods which is to be delivered.

These qualifications may be added to either of the first two classes, and in that event will limit and explain the meaning of the quantity as restricted by the expression *more or less*.

In the first of these cases, if the goods delivered vary materially in quantity from the amount bargained for, the contract will be violated. In the second, " the naming of the quantity is regarded only as an estimate of the probable amount, in reference to which good faith is all that is required of the party making it." Brawley v. U. S., *supra.*

In the third case, the seller is bound to deliver the quantity, determined by the future action on the part of the seller or buyer, as the contract provides. For instance, in the case cited the agreement was to deliver "eight hundred and eighty cords of wood, more or less, as should be determined to be necessary by the post commander," etc., and it was held that, the post commander having determined that only forty cords were needed, it was held that the United States was not liable for any number of cords beyond the forty cords delivered. See, also, Guillim v. Daniel, 2 Cromp., M. & R., 61; Robinson v. Noble's Adm'rs, 8 Pet., 181; Pembroke Iron Co. v. Parsons, 5 Gray, 589.

Applying these principles to the present contract, we find that it does not in the least assimilate itself to the first class, as before defined. Disregarding the provisions of the third section of the agreement, we have a contract of the second class, in which there is merely an estimate that the number in the brands and marks mentioned is about ten thousand, and the seller will not be liable if it is less, provided he has acted in good faith in making the estimate. His contract is in effect to deliver all the cattle in the named brands, with certain exceptions, be the same ten thousand, or more or less; and, unless he has committed a fraud in making his estimate, his contract is fulfilled when he furnishes the entire stock in those brands, less the exceptions.

But the third section explains and qualifies the meaning of this stipulation of the parties, and shows that the quantity sold was only so much as should be actually delivered by the 1st of August, 1881. This section adds, by way of giving greater strength and clearness to the meaning of the parties, that all the cattle in said brands, meaning the said supposed ten thousand head, left on the range after the 1st of August, 1881, are not embraced in the sale, but remain the property of the vendors. Words could not be plainer nor more explicit to guard the sellers against any conveyance of, or obligation to convey, ten thousand cattle or thereabouts, or all in the brands mentioned, but only such of them as they should deliver by a certain time. The only question left open was as to what diligence the vendors were to use in gathering and delivering the cattle. This might have been the subject of a stipulation, and then the vendors would have been in default and liable to damages, if the failure to deliver was in consequence of a neglect to comply with such stipulation. But there was no agreement on this subject, and in its absence the law says that the parties intended that reasonable care, skill, energy and diligence must be used by the person charged

with that duty in collecting the cattle, and placing at the proper place of delivery within the stipulated time, and this was a question for the jury, under proper instructions from the court; there being no allegation in appellant's pleadings that the appellees had falsely or fraudulently represented that there were ten thousand cattle in the brands named at the date of the contract, but the averment being to the contrary, *i. e.,* that there were that many, but that they were not all delivered.

Thus the question at issue between the parties was in effect narrowed down to this: Did the sellers deliver all the cattle, subject to the contract, which, by the use of proper diligence, they could have delivered at the time and place at which they contracted to make the delivery? An examination of the charge of the court shows that it was entirely in accordance with the views of the law announced in this opinion, and submitted them to the jury in a clear, concise and able manner.

After briefly stating the pleadings, the court charged that the contract contained no guaranty as to the number of cattle in the marks and brands. That it was a mere contract of sale of said marks and brands, and an undertaking by the sellers to deliver said stock by August 1, 1881, and that such only as were actually delivered by that time passed to the vendee, the balance remaining unaffected by said contract. He also charged that the vendors were obliged to use, to effect such delivery, that care, skill and energy which a good business man engaged in the stock business would use to collect said stock of cattle and deliver them at the place where these vendors were bound to furnish them to the vendee, and at the time mentioned in the contract. If the vendors did this, it amounted to reasonable diligence, and hence the charge fulfilled the requirements of the law in all these respects.

This left to the jury the power to determine as to the diligence used by appellees in collecting and delivering the cattle, and, as the evidence on that subject was conflicting, and, to say the least, not very unequally balanced, the finding of the jury cannot be disturbed on that account. Mullins proved the employment of sufficient hands for the purpose; their constant work at gathering and delivering; the delays caused by the death of his father and of the purchaser of the stock; the fact that the cattle were scattered over a country for hundreds of miles, and that they were faithfully searched for in every place where they ranged, and that there were not more than six thousand one hundred or six thousand two hundred, all told, subject to the contract, after deducting those excepted. Of these he had

actually delivered five thousand and sixty-one and tendered five hundred more, leaving from four to six hundred undelivered. If this was the evidence credited by the jury, it was certainly sufficient to show reasonable diligence in collecting and delivering all but the four or six hundred head; and as damages were allowed for failure to deliver, to the extent of $1,500, and there was no culpable failure in reference to any other portion, we must conclude that the allowance was made in reference to them.

It is further said by appellant that the charge of the court as to the tender of the five hundred head of cattle on 27th July, 1881, was erroneous. The court charged that all cattle tendered and refused were taken out of the contract, which was correct law unless the tender was attended with some circumstance that prevented it from being equivalent to a delivery. The only circumstance of this character which the evidence justified the court in submitting to the jury was stated in the charge. The appellant claims that the tender was coupled with a condition that Driskill should receive this herd of five hundred in full satisfaction of the balance due on the contract. This is the testimony of Driskill; but the evidence of Mullins shows that when he offered the cattle he told Day on 27th July, 1881, that, as far as delivering more cattle was concerned, he did not have time to deliver them before the contract would expire, and if he should deliver any more he would have to take Driskill's word for the pay. He offered to deliver the cattle that he had brought with him in accordance with the contract, and notified the men to deliver as they had done with all before in Day's life-time. Now, it is evident that up to this time there was no condition asked in reference to the tender, and none was asked until Driskill refused to receive the drove because they were of inferior quality, about which the contract did not provide; and unless he would, for that reason, deliver one thousand five hundred more. It was in reply to this demand that Mullins told Driskill that he did not have time to collect more before the expiration of the contract, and that, if he took the cattle, he (Mullins) would consider the contract at an end whether Driskill did or not. The jury evidently gave credit to this testimony; and, if they did, they believed that Mullins originally annexed no conditions to his tender, and afterwards only refused to submit to an unreasonable demand on the part of Driskill, viz., that he should do a thing which it was out of his power to do, and which his contract did not demand of him. It was Driskill that imposed unreasonable conditions as to the tender, and it was his refusal to receive the cattle unless these conditions were complied with that

rendered the tender ineffectual. If the cattle offered had been received without anything passing upon the subject, it is clear that the contract would have been complied with on the part of Mullins, except, perhaps, as to the four hundred or six hundred head before mentioned. The demand, therefore, for fifteen hundred more imposed new burdens and conditions on appellees, which they were not bound to submit to in order to secure an acceptance of the cattle tendered.

The court did not err in refusing to give the instructions asked by defendants' counsel, because the correct law upon the subject of these charges had already been placed before the jury in the general instructions submitted to them. The measure of damages asked by this charge is, in effect, what the court had already given. It was not what is contended in the twelfth assignment of error, the difference between the contract price and the highest market value between the date when to be delivered and the time of trial, for the undelivered cattle had not been paid for. Randon v. Barton, 4 Tex., 289.

It is complained that the court should not have rendered a judgment foreclosing the lien provided for in the contract upon a verdict which does not find that such lien existed. The contract was pleaded by both parties and put in evidence without objection, and this showed that if the plaintiffs were entitled to recover they were entitled to have the lien enforced. By failing to deny this in their pleadings, the defendants admitted the lien, and there was no proof about it necessary, and nothing in reference to it for the jury to determine. Hence the lien was properly foreclosed without a verdict establishing it. Pearce v. Bell, 21 Tex., 691.

As to the numerous objections taken to the ruling of the court excluding appellee's evidence, it will be found, upon an examination of it in connection with the principles upon which this opinion is based, that all of this testimony was irrelevant and unimportant, and tended to raise issues foreign to the cause.

The evidence of Wm. Day, mentioned in second assignment, was offered, it is said, because it proved an implied admission of Mullins that there were other cattle undelivered and which could have been delivered under the contract; and that it would have shown a purpose not to deliver more cattle unless for a better price. It might have shown that he expected that some cattle would be undelivered at the expiration of the contract. This was a contingency contemplated by the parties as likely to happen without fault on the part of the sellers, and hence they made provision for it. For fear

that the jury might put the very construction upon it which appellant thinks they would have done, the evidence should not have gone to them.

The fact proposed to be proved by Driskill in his answer to the twentieth interrogatory, and excluded by the court, was irrelevant and incompetent. The utmost that it would have proven was that Mullins supposed or knew that there were cattle subject to the contract in his possession after its expiration. This was admitted; moreover, it did not tend to prove the only issue on that subject, viz., that they were there because he had not used due diligence to collect and deliver them in time.

The other evidence ruled out tended to show what was Chas. Mullins' estimation of the number of cattle in the brands conveyed before and subsequent to the date of the contract. What they were before was not important, because they might have been increased or diminished by purchase or sale between that time and the date of the contract. Besides, the contract estimated them at ten thousand; and whether this estimate was right or wrong could make no difference. The point was, did the sellers use diligence to deliver the cattle in time? and this testimony would have thrown no light upon that subject.

Upon the whole we see no error in the judgment, and it is affirmed.

AFFIRMED.

[Opinion delivered June 8, 1883.]

Associate Justice WEST did not sit in this case.