LIGHT et al. v. HART. (No. 5803.)

(Court of Civil Appeals of Texas. San Antonio. Feb. 28, 1917. Rehearing Denied April 11, 1917.)

SALES ⚫71(1)—CONTRACTS—CONSTRUCTION—SUBJECT-MATTER.

A contract for the purchase of 1,000 head of steers "more or less" three years old and up, as hereinafter specified, etc., when construed with a supplemental contract, *held* unambiguous and to constitute a contract for the purchase of all the cattle of the defendant then on his range, three years old or over, with a "cut back" to reduce the number to a select 1,000 cattle, and another "cut back" of 10 per cent. of the 1,000 head, the consideration to be $45 a head for the 900 head so selected, as provided by the contract, and $30 a head for all that remained.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 189, 196.]

Moursund, J., dissenting.

Appeal from District Court, Val Verde County; W. F. Ezell, Judge.

Action by D. W. Light and another against D. Hart. Judgment for defendant, and plaintiffs appeal. Reversed and rendered.

Geo. M. Thurmond, of Del Rio, and Ball & Seeligson and C. W. Trueheart, all of San Antonio, for appellants. Boggess & Smith, of Del Rio, for appellee.

FLY, C. J. The appellants, D. W. Light and Asa H. Jones, sued appellee for damages arising from the breach of a certain contract to sell certain cattle to appellants. The cause was submitted to the jury on special issues, and upon the answers thereto judgment was rendered that appellants take nothing by their suit. The cause comes before this court as an agreed case, under the provisions of article 2112, Revised Statutes of Texas. The agreement, so far as necessary to this decision, is as follows:

"First. Plaintiffs' cause of action is based upon two certain written contracts, true copies of which were attached as exhibits to plaintiffs' First Amended Original Petition and the originals of which were introduced in evidence upon the trial of this said cause, same being as follows, to wit:

"'The State of Texas, County of Bexar.

"'This memoranda of agreement by and between D. Hart hereinafter styled first party, and Light & Jones, a firm composed of D. W. Light and Asa H. Jones, hereinafter styled second party, witnesseth:

"'First. First party has bargained and sold and agrees to hereafter deliver to second party, one thousand (1,000) head of steers, more or less, three years old and up, as hereinafter specified, the cattle to be delivered being branded (a heart) on ———, and there may be other brands and marks on the above cattle, but the above brand is the holding brand, said cattle being located in the pastures and range of first party in Val Verde and Terrell counties.

"'Second. Said second party shall have a cut of ten (10) per cent. on all cattle of the above class delivered up to one thousand head, which ten (10) per cent. cut shall include all cattle of the above class cut out because of defects or otherwise.

"'Third. Should there be more than one thousand head of cattle delivered of the ages above stipulated, then second party may cut out the smallest steers and shortest aged steers so as to reduce the number of cattle down to one thousand head, and then out of the aforesaid one thousand head second party may take their ten per cent. cut as in the foregoing paragraph provided.

"'Fourth. As a consideration for the sale and delivery of the cattle as hereinbefore specified, said second party agree and bind themselves to pay to the first party forty-five ($45.00) dollars per head for each and every steer delivered under this contract.

"'Fifth. First party agrees and binds himself to gather and deliver all cattle under this contract f. o. b. cars, S. P. Ry. Co. at Langtry, Lozier, or Pumpville, making each delivery at any one of the above stations as first party may deem most convenient to himself.

"'Sixth. Said second party shall have the privilege of taking as many of the two year old steers belonging to said first party in the above pastures and range as said second party may desire, this privilege being a part of the consideration of this contract, but said second party shall not be required to take any of the said two year old steers unless they so desire, but for each and every two year old steer taken by said second party, they agree and bind themselves to pay the sum of $45.00 per head.

"'Seventh. Said first party shall begin delivering under this contract June 1st, 1915, unless notified by said second party to begin delivery at an earlier date, in which case, said first party shall have ten (10) days' notice of the time when said second party desires delivery to begin, and said first party shall have as much as six (6) weeks to complete delivery after beginning the same; and deliveries shall be made in four or more bunches as said second party may desire.

"'Eighth. As an earnest obligation said second party has executed and delivered their promissory note in the sum of $6,000.00 due July 1st, 1915, without interest, and the balance of the purchase money shall be paid as each delivery is made until the last delivery, when the money represented by said note shall be credited on the last payment and paid when due, provided the deliveries are completed before the due date of said note.

"'Ninth. First party shall furnish horse and board to one man representing second party in gathering and delivering said cattle.

"'Tenth. In case of any disagreement between

the parties to this contract as to whether or not the cattle offered for delivery are three years old, then such disagreement shall be settled by toothing the animal, and if the animal shows four large teeth, then the same shall pass for three years of age.

" 'Eleventh. The cut of ten per cent. or more as above provided, shall be made on the range and not at the stockyards, provided, however, that the final cut shall be had on the last delivery; and provided further, that of the culls made during the several deliveries provided for the said first party shall not be required to hold to exceed two hundred and fifty (250) head of culls at any one time, and provided further, that should any of the steers cut out escape so that they cannot with practical effort be delivered again, then the number so escaping and not delivered, shall not be counted as against the cut of the said second party.

" 'Twelfth. The said second party bind and obligate themselves to receive, accept and pay for as many as nine hundred (900) head of cattle of the class provided for in the first paragraph of this contract, provided the number delivered is sufficient to make the aforesaid number after the cut provided for of ten per cent. in this contract and under the conditions of this contract.

" 'Thirteenth. The cattle sold under this contract are all the cattle in the pastures and range of D. Hart of the classes ·referred to, and are the ones inspected by said second party, and said cattle are to remain upon the range until delivery is made, unmoved, the said first party hereby warranting that he has not sold or disposed of any of the cattle above referred to since the inspection by the said second party.

" 'Witness our hands this the 5th day of March, A. D., 1915. .

" 'D. Hart, First Party.
" 'Light & Jones, Second Party.

" 'Pumpville, Val Verde Co.,
" 'Texas, May 20, 1915.

" 'I hereby agree to sell to Light and Jones, all cut backs from cattle sold to same parties and to be delivered in June and July, 1915 (this being all steer cattle, three years old and up, cut out from steers sold), at ($30.00) thirty dollars per head. These cattle to be received f. o. b. with other cattle and eliminating the holding of cattle for said parties.      D. Hart.'

"Second. Plaintiffs contended and insisted upon the trial of this said cause that said contracts were unambiguous, and covered and included all of the steer cattle, three years old and upward, owned by defendant, D. Hart, at the time of making said contracts, on and in his pastures and range in Val Verde and Terrell counties, Tex., and that under the terms and conditions of said two contracts 900 head thereof were to be sold and delivered to plaintiffs at $45 per head, and all of the remainder at $30 per head, but that, if said contracts were ambiguous, it was the agreement and understanding between the parties that defendant was selling and should deliver to plaintiffs all of the said steer cattle, three years old and upward, at the price of $45 per head for 900 head and $30 per head for all in excess of 900 head.

"Defendant contended and insisted upon the trial of this said cause that said contracts were unambiguous, but that the same only included and covered 1,000 head of cattle, of which 900 head were to be delivered at $45 per head and 100 head at $30 per head, but that, if said contracts were ambiguous, it was the agreement and understanding between the parties that defendant was selling and should deliver to plaintiffs only 1,000 head of the steer cattle, three years old and upward, then owned by him.

"The trial court held that said contracts were ambiguous, and permitted, over the objection of plaintiffs and defendant, testimony as to the effect of said contracts, and how the respective parties thereto construed and acted under same.

"Third. The case was submitted to the jury upon special issues, and the jury found, in effect, that it was the intention of the parties to said contract of May 20, 1915, that the plaintiffs were only to have and receive thereunder, and in connection with the original contract, 100 head (in excess of the 900 head referred to in the original contract) at $30 per head.

"Fourth. It was an undisputed fact upon the trial of the case that 1,207 head of steer cattle, three years old and upward, had been actually gathered by the said Hart; the defendant, however, refusing to deliver the 207 head in excess of 1,000 to plaintiffs under said contracts claiming that said contracts only covered and included 1,000 head, and the excess, or 207 head, were sold to and received by plaintiffs under an independent contract at $43.50 per head.

"Fifth. It is further agreed by parties plaintiffs and defendant that the only question involved upon this appeal is one of law, as to the construction of said two contracts, and that, if the appellate court should hold that the same are unambiguous and covered and included all of the steer cattle three years old and upward owned by defendant, Hart, that this cause should be reversed and rendered in favor of plaintiffs for $2,794.50, with interest thereon at the rate of six per cent. per annum from the 12th day of July, 1915, being $13.50 per head on 207 head of cattle which were actually gathered by the said D. Hart in excess of 1,000 head, and all costs; whereas, if the court should hold that said contracts were ambiguous and properly explainable by extraneous evidence, or, if not ambiguous, but by their terms covered and included only 100 head, 900 head at $45 per head and 100 head at $30, then this said case should be by the appellate court affirmed, at costs of plaintiffs (appellants)."

The first clause of the contract read in connection with the thirteenth clause, we think, clearly shows that it was the intention of the parties to include all the three year old steers owned by appellees in Val Verde and Terrell counties. In the first clause it is stated that appellee would deliver to appellants 1,000 "head of steers, more or less, three years old and up," then this is followed by the declaration in the thirteenth clause that:

"The cattle sold under this contract are all the cattle in the pastures and ranges of D. Hart of the classes referred to."

There is no ambiguity about those clauses. This view of the contract settles the question as to what cattle were to be delivered. If that view be correct, then no question could arise as to what cattle should be included among the "cut backs," which are described as "being all steer cattle three years old and up cut out from steers sold"; that is, all the cattle cut of the three year old steers and over that appellee owned in the counties named. Language could not be plainer in describing the cattle sold than "all the cattle in the pastures and range of D. Hart of the classes referred to," and there is nothing in any other clause that contradicts or obscures this plain language. The price of none of the cattle is fixed in the original contract except that of the 900 head culled from all the three year olds owned by appellee, in the manner fixed by the contract by two "cut

backs," the first being to reduce the number to a select 1,000 steers and then another cut of 10 per cent. of that 1,000 steers. In the twelfth paragraph there is a promise to pay the price set out in the contract for the 900 select steers. Afterwards it seems that the parties realized that no price had been fixed on the "cut backs" evidently included in the recital that "the cattle sold under this contract are all the cattle in the pastures and range of D. Hart of the classes referred to." To fill the omissions in the original contract the supplemental contract was executed by which appellee agreed to sell appellants all cut backs, and to make it more positive, the "cut backs" are described as "being all steer cattle, three years old and up, cut out from steers sold."

If the construction is put upon the words, "steers sold," so that they are made to include only the 900 steers, then the cattle cut out from the 900 steers were not only the last cut of 100 cattle, but the first cut of 207 cattle. The first lot of steers was as much "cut out" as the last lot, and the first lot is so treated in the contract. It is provided in clause third that if more than 1,000 cattle were delivered, appellants could cut them so as to reduce the number to 1,000, "and then out of the aforesaid 1,000 head second party may take their ten per cent. cut as is in the foregoing paragraph provided." This clause fixed the status of the "cut backs" as well as it did the second ones, and when in the supplemental contract the term, "all cut backs" is used, it would, in reason and common sense, include "all cut backs," whether of the first or second cut. In no place in the contract is the word "cut backs" made to refer exclusively to those under the 10 per cent. cut. The language is plain and unambiguous.

If there be any uncertainty in other parts of the contract as to the cattle to be delivered, every doubt or uncertainty is removed in the last clause of the original contract, and it is plain that appellee sold to appellants all of his cattle of the classes mentioned in other parts of the contract, and the supplemental contract to remove any imagined obscurities and to fix the price reinforces the last paragraph of the original contract by specially including the "cut backs" in the sale. To say that all the "cut backs" were not included in the last contract would be to place appellee in the position of selling the 100 head of steers culled from the selected thousand at a low price and keeping the "smallest steers and shortest aged steers." Business sense and management would have included all the "cut backs" in second contract, as was done by appellee.

There is no conflict in the language used in the first clause of the contract, wherein the cattle sold are described as "one thousand more or less," and the language of the last clause, wherein the cattle are described as being all cattle of certain classes owned by appellee. The clauses do not create an ambiguity, but are explanatory of each other. The number, 1,000 more or less, is merely descriptive, and in perfect accord with other portions of the contract, which show that all the cattle were sold. Appellants in their brief have collected a number of authorities bearing on such contracts and their construction, and sustaining the construction placed on this contract by this court. Day v. Cross, 59 Tex. 595; Mosby v. Smith (Mo. App.) 186 S. W. 49; Morris v. Wibaux, 159 Ill. 627, 43 N. E. 837; Land Co. v. White, 82 Tex. 477, 18 S. W. 603.

The original contract clearly shows an agreement that appellee would deliver to appellants at least 1,000 three year old steers and over that age, and that from the number delivered, if more than 1,000, appellants should have the right to cut out all of them down to 1,000, and from that number should have the right to cut out 10 per cent. or 100 head more. In other words, the contract was for appellants to select out of the cattle delivered 900 head of steers and pay for the same at the rate of $45 a head. It is true that in clause 1 of the contract it is recited that 1,000 cattle had been sold, but that clause must be construed with the second and twelfth clauses, where it is clearly and unequivocally stated that appellants were only bound for 900 head of cattle. There can be no doubt about this proposition. Appellee acquiesces in this statement, and with him we ignore the thirteenth clause and treat the contract as though that clause was not contained therein. Then there can be no doubt or ambiguity as to what number of cattle were sold, for it is plainly stated that it was 900 head. After fixing that number in the original contract beyond cavil or dispute, the supplemental agreement was made to sell to appellants all the cattle "cut out" of the "cattle sold." What cattle were sold? Why the 900 head of course, for only that number were described. Then when we fix the number sold it is easy to fix the number "cut out" of it, for it was all the three year old steers delivered or tendered by appellee to appellants, or 1,207 head of steers. Under the clear and unequivocal terms of the contract the first cut were all those in excess of 1,000 steers, then a further cut of 100 head from the remaining 1,000 steers. The only way to avoid the plain terms of the contract is to deny that there were two cuts of the cattle, which, of course, cannot be done with any reason or propriety.

While we could, as hereinbefore stated, consider the contract without reference to the thirteenth clause, which plainly states that all the three year old steers and over were sold, there is no conflict between it and the other provisions of the contract. By its terms it strengthens our construction of the contract, and renders it clear and unambiguous. There is no conflict between it and other parts of the contract.

We have put no stress upon the words "more or less," because whatever force and effect the word, "more" might otherwise have had is destroyed by the plain terms of the contract as to the number of cattle contracted to be sold. Appellants by the contract could not have been compelled to take more than 900 head of cattle, and the question as to whether they could have been compelled to take a less number is of no practical importance in this case.

Construing all parts of the original contract together, in the light of the second contract, as should be done, we are convinced that it was a contract for the purchase of all the cattle of appellee, three years old or over, the consideration to be $45 a head for 900 head, selected as provided by the contract, and $30 a head for all that remained.

As agreed by the parties, if this court reached the conclusion, at which it has arrived, the judgment of the lower court will be reversed, and judgment here rendered that appellants recover of appellee the sum of $2,-794.50, with 6 per cent. interest per annum thereon from July 12, 1915, and all costs in this behalf expended.

MOURSUND, J. (dissenting). It seems clear that when the parties appended to the original contract the agreement dated May 20, 1915, they intended to sell steers additional to those contracted to be sold in the first contract, and not to supply anything left out of the first contract by inadvertence. Did they intend that Hart agreed to sell all of his three year old steers over and above 900 head at $30 per head? If so, they could have easily said so. What they did say was that Hart thereby agreed to sell to Light and Jones all cut backs from cattle sold to same parties, and then again particularly describe them as all steers "three years old and up cut out from steers sold." This language is so plain that it cannot be construed to mean all the three year old steers over and above 900 head owned by Hart, and appellants do not plead mistake, so they are driven to admit that resort must be had to the original contract to ascertain what steers were sold, in order to determine to what steers the contract of May 20, 1915, relates. They, therefore, contend that in the first contract Hart bound himself to sell to appellants all of his steers three years old and up, and this contention is sustained in the majority opinion. In fact, it is held that such intention is so apparent that the trial court erred in holding the contract to be ambiguous. It is strange that if parties intended to contract for the sale of all three year old steers in a certain pasture, steers which had been inspected by the prospective buyers, and that they were to pay $45 a head for 900 head and $30 a head for the remainder, they could not have so provided in plain and unequivocal terms, and it would also be very unusual for parties to a contract to omit the consideration for about 300 head of cattle out of 1,200. It may be that by selecting certain portions of the contract and failing to give effect to others, such an intention can be deduced, but can it be said that a contract is unambiguous if it is necessary to ignore certain provisions in order to give it a definite meaning?

It is true that the first clause in the contract states that Hart agrees to sell 1,000 head of steers, more or less, three years old and up, and that the thirteenth and last clause states that the cattle sold are all of the cattle in the pasture and range of D. Hart of the classes referred to but these are not the only provisions, and if they be construed as making the contract, one for the sale of all steers three years old and up, the parties went to a lot of trouble for nothing. If they contracted to sell all the steers, then the only omission, according to the majority opinion, was the failure to state the price for the steers in excess of 900 head. It is true there is only one provision fixing the price of the steers three years old and up sold to Light and Jones, but that provision is explicit. It is found in paragraph 4, and says that second parties agree and bind themselves to pay to first party $45 per head for "each and every steer delivered under this contract." If the contract was for the sale of all the steers, then the price for all was fixed at $45 per head, but it is not stated in the subsequent agreement that any mistake was made in the original contract as to the price of some of the steers and that the parties seek to correct such mistake. If the contract was for the sale of all the steers, the provision for a 10 per cent. cut out of 1,000 head was superfluous, and the further provision that Light and Jones could virtually select the 1,000 head before being required to make the cut, if more than 1,000 should be delivered was also uncalled for. The fact that Light & Jones only bound themselves to take 900 head as is shown in paragraph 12, also contradicts the theory that the first contract was for the sale of all the cattle, and that the parties omitted to state the price for those other than the 900. Again, if all of the steers were to be taken by Light & Jones, there would be no occasion for the holding as many as 250 culls and for the cut to be made on the range. In view of all these provisions, is the contract clearly one for the sale of all the steers owned by Hart of the named class, or is it a contract for the sale of 1,000 head of steers, with a 10 per cent. cut, giving the buyers the right of selecting the 1,000 head before making the 10 per cent. cut as best they could, in view of the delivery being made in four or more bunches. It appears to me that the latter construction does less violence by far to the language of the contract than the one contended for by appellant.

I am unable to see any reason for subordinating the other provisions of the contract to the thirteenth paragraph. The following statements made by Mr. Elliott in his work

on Contracts, §§ 1514, 1515, are deemed peculiarly applicable to this case:

"The actual contract of the parties must be deduced from the entire agreement and from all its provisions considered together, and not from specific provisions or fragmentary parts of the instrument, because the intention of the parties is not expressed by any single part or provision of the agreement, but by every part and term so construed, if possible, as to be consistent with every other part, and with the entire agreement, since the parties could not have intended apparently conflicting clauses in a contradictory sense. Effect must be given to all the provisions and parts of the contract where possible, and no part should be rejected unless absolutely repugnant to the general intent. * * * But while words or clauses in a contract apparently repugnant should be reconciled if it can be done by any reasonable construction, yet a proviso which is utterly repugnant to the body of the contract and irreconcilable with a former clause and repugnant to the general purpose and intent of the contract will be set aside or rejected; likewise, a subsequent clause, irreconcilable with a former clause and repugnant to the general purpose and intent of the contract, will be set aside or rejected."

That part of the thirteenth paragraph relied upon by appellants is repugnant to the general purpose and intent of the contract. The paragraph was probably inserted for the purpose of preventing Hart from removing from his pasture any steers inspected by appellants, and out of which these purchased were to be selected, and the language used is so inapt as to create a conflict between such provision and other provisions of the contract in which the cattle sold are described. In view of the fact that the other description of the cattle accords with the various provisions hereinbefore pointed out, that part of paragraph 13 relied on by appellants should probably be rejected on the theory that the draftsman erred in saying the "cattle sold under," instead of "the cattle described in." But, at any rate, it should not be held to control all the other provisions, for, to say the least, such an intention is not plainly apparent.

It is true that if it be held that Hart intended to let the buyers first cut the herd down to 1,000 head and then take 900 at $45 and 100 at $30, it would be reasonable for him to be willing to contract that those cut out in selecting the 1,000 head should also be sold for $30. But at the time of the contract the buyers might not have been willing to take them at that price, and even if Hart was making a concession, it must be remembered that he was avoiding the holding of cattle, and was making an agreement which was susceptible of the construction that he intended to eliminate all cutting and selecting, and just deliver, f. o. b. the 1,000 head of steers as he gathered them, and the buyers would pay him $45 per head for 900 and $30 per head for the other 100.

I have endeavored to show that the contention made in appellants' brief, and sustained in the first part of the majority opinion, is incorrect, and that the language of the contract bears out appellee's theory much more strongly than that of appellants. Appellee's contention is expressed in his brief as follows:

"We think it clear that what the parties intended by this contract was that Light & Jones should top out of all of Hart's three year old and ups, 1,000 head, if he had more than 1,000 head, and this topped 1,000 head Light & Jones were to buy, subject to a 10 per cent. cut therefrom. In the contingency that there were only 1,000 head of three year old and ups that could be tendered, these Light & Jones were to take at $45 per head after cutting back 10 per cent., or 100 of them. If there were more than 1,000 head, the whole tenor of the original contract shows that Light & Jones by the contract acquired the right to cull them out till they were reduced to 1,000 head. This 1,000 head they were to take at $45 per head, subject to the ten per cent. cut. Clearly, under the contract, they were only buying 1,000 head with a 10 per cent. cut from that 1,000 head. True they acquired the right to pick this 1,000 head out of all of Hart's three years old and up cattle that were on his range in Val Verde and Terrell counties."

However, appellee, while contending for his construction in argument in his brief, need only show that the contracts are ambiguous in order to sustain the judgment of the trial court, the jury having found that his construction of the contract expresses the contract actually made.

The theories advanced by the respective parties and contended for in their briefs, and also presumably before the jury, are supplemented in the opinion of the majority by an additional theory, which is considered to be deducible from the contract, and under which it is thought the judgment should be reversed. This theory is that if the original contract does not call for the sale of all the steers, then that it calls for the sale of only 900 head, and as it is not provided that there should be any cut backs out of said 900 head, the expressions used in the second contract should be given the meaning of steers cut away from the 900 head and be held to include all the remainder of the steers. Such a theory can only be supported by saying that, as appellants were only bound to take 900 head, the parties in making the second contract meant, by the expression "cattle sold," to say 900 head. Can it be said that such an intention is clearly apparent? I fail to find any portion of the original contract in which it describes the cattle sold as 900 head. The parties described the cattle sold as 1,000 head, more or less, which means approximately 1,000 head. They said in paragraph 2 that Light & Jones should have a cut of 10 per cent. on all cattle delivered, up to 1,000 head, and in paragraph 13 that the cattle sold were all the cattle, and also that Light & Jones were bound to take 900 head if enough were delivered to make such number after the 10 per cent. cut had been made. If the steers had risen in value to $60 a head between the date of the contract and date of deliveries, and the second contract had not been made, appellee would doubtless have ascertained that he had sold 1,000 head

of steers and not 900, for appellants would, no doubt, have taken advantage of the terms of the contract and waived their privilege of cutting out 10 per cent. In speaking of cattle sold, did they mean 900 head, or did they mean all, or did they mean 1,000 head. If the matter is so uncertain that a theory not advanced by appellants can be deduced which makes the parties mean 900 and not all, then is it not sufficiently uncertain that appellee's theory may be correct, and that the parties regarded the contract as one for the sale of 1,000 head with a 10 per cent. cut. The contract is framed in the language used in the cattle business, and I fail to see how it can be said that the contracting parties clearly contemplated as cattle sold those the buyers were bound to take, and not those they were at liberty to take under the contract. There is indeed much in the contract which indicates that they contemplated 1,000 head as the number sold, with a 10 per cent. cut allowed, but I believe the theory that they contemplated as cattle sold 900 head can find no basis in what they said, but must rest upon construction based upon a certain conception as to what is sufficient in law to constitute a contract for the sale of property. When it becomes necessary to theorize about the intention of the parties as disclosed by the language of a contract, can it be said to be unambiguous? Of course if it were admitted that the parties meant by "steers sold" only 900 head, it would follow that there could not be any which were cut out of those sold, and the words in the second contract would necessarily mean cut away from those sold. If it were admitted that such a construction can be given thereto, it certainly is not clear that the parties used it in any such sense.

Believing as I do that the appellee's construction does less violence to the language of the contracts than appellants', but that the court did not err in holding the same ambiguous, I think the judgment should be affirmed.